Below is an opinion of the court.

*TRISH M. BROWN*
TRISH M. BROWN
U.S. Bankruptcy Judge

**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re:<br><br>DOUG TISON PICKETT,<br><br>               Debtor. | Bankruptcy Case<br>No. 18-33652-tmb13 |
| DENNIS' SEVEN DEES LANDSCAPING, INC.,<br>an Oregon corporation,<br><br>               Plaintiff,<br><br>   v.<br><br>DOUG TISON PICKETT,<br><br>               Defendant. | Adv. Proc. No. 19-3004-tmb<br><br>MEMORANDUM OPINION[1] |

     This adversary proceeding came before the court for trial beginning on September 16, 2019, and concluding on September 19, 2019. Plaintiff Dennis' Seven Dees Landscaping, Inc. ("DSDL") was represented by David Hosenpud; Debtor Doug Tison Pickett was represented by Darien Loiselle and David Anderson. DSDL asserted eight claims against Debtor. Complaint, ECF No. 1. Prior to the trial, I granted summary judgment in favor of Mr. Pickett on DSDL's claims for misappropriation of trade secrets, breach of fiduciary duties, and nondischargeability

---

[1] This disposition is specific to this case and is not intended for publication or to have a controlling effect on other cases. It may, however, be cited for whatever persuasive value it may have.

under § 523(a)(6).[2]  Order, ECF No. 61.  In the same order, I granted partial summary judgment for Mr. Pickett on DSDL's claim for conversion.  *Id.*

The trial lasted four days, included testimony from fifteen witnesses, and featured 373 documentary exhibits.  I listened carefully to the trial testimony of witnesses, and have since reviewed the notes I took at the trial, recordings of witness testimony, the parties' memoranda, and the admitted exhibits.  In addition to examining the factual evidence, I have weighed the parties' legal arguments and reviewed relevant authorities, both as cited to me by counsel and as located through my own research.  Based on my review and consideration, I have reached the decision set forth in this opinion.  The findings of fact and conclusions of law stated in this opinion constitute my findings and conclusions for purposes of Federal Rule of Civil Procedure 52(a) (applicable via Federal Rule of Bankruptcy Procedure 7052).

DSDL tried five claims against Mr. Pickett.  The gravamen of DSDL's case is a claim for fraud and an accompanying claim of nondischargeability under § 523(a)(2)(A).  DSDL also asserts claims for conversion, intentional interference with economic relations, and nondischargeability under § 523(a)(4).  The plaintiff in any nondischargeability action must prove its case by a preponderance of the evidence.  *Branam v. Crowder (In re Crowder)*, 226 B.R. 45, 52 (9th Cir. BAP 1998) (*citing Grogan v. Garner*, 498 U.S. 279, 291 (1991)).

## I.  General Factual Background

Plaintiff DSDL is a large landscaping company that provides design-build services for both residential and commercial projects in the Portland metropolitan area.  Debtor Doug Pickett was a longtime employee of DSDL.  By the time his employment ended in late 2016, Pickett was working as DSDL's manager of commercial construction projects.  At some earlier point, Pickett had identified what he believed to be a business opportunity in the commercial landscaping industry.  Specifically, he concluded there was an unmet need for the sale and transportation of soil and aggregate materials.  DSDL's chief operating officer Nathan Dirksen testified that

---

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, title 11, United States Code.

Pickett brought this opportunity to DSDL's leadership in January or February of 2015, encouraging the company to expand into the materials hauling business. According to Dirksen, DSDL management was not interested in such an expansion because of perceived financial risks inherent in that line of work.

After DSDL declined to go into dirt-hauling business, Pickett decided to do so himself. With his business partner Nathan Lachner, Pickett formed LP Northwest, LLC ("LPNW"). Pickett then proposed to Dirksen that LPNW provide hauling service to DSDL. After obtaining approval from DSDL vice president Dean Snodgrass, Dirksen agreed to use LPNW, provided that there was "clear documentation and transparency" regarding the two companies' interactions. Although DSDL initially used LPNW solely for transporting materials, Dirksen testified that after a "couple of months," DSDL began to use LPNW to both procure and transport materials.

The relationship between DSDL and LPNW was not governed by any clearly-articulated contractual agreement, either written or oral. As discussed in more detail in subsequent sections of this opinion, DSDL has varyingly asserted that it was entitled to "best pricing," "market pricing or better," or "pass through pricing" under the terms of its agreement with LPNW. DSDL's primary documentary evidence concerning the terms of the relationship was one page of hand-written notes, taken by Dean Snodgrass in preparation for a meeting in July 2016 (over a year after the parties started to do business together). Pltf. Exh. 234.

Beginning in mid-2015, DSDL employees began identifying specific instances in which LPNW's prices were higher than those charged by DSDL's other regular vendors. Despite this strong evidence that there was no meeting of the minds (at best), or misconduct on the part of LPNW (at worst), DSDL continued the relationship.

In May 2016, DSDL was selected as a subcontractor for the construction of the new South Cooper Mountain High School ("SCMHS") in Beaverton, Oregon. Pltf. Exh. 19. Dean Snodgrass testified that the SCMHS project was "one of the largest projects" that the company's commercial division had undertaken as of that time. By all accounts, the process of preparing for

and implementing DSDL's portion of the SCMHS project was chaotic. The general contractor was demanding and the project specifications were in a constant state of flux. LPNW's work consisted, in part, of screening soil and blending it with compost for use in the school's landscaping. The soil was already on-site, but LPNW soon discovered that the moisture content was higher than anticipated, which meant the screening equipment could not process the soil. Mr. Lachner testified that LPNW pressed ahead with the project even though the company had to modify its screening method, resulting in approximately double the amount of work that he had anticipated.

Then, sometime in the fall of 2016, DSDL employees discovered evidence that they interpreted as proof that LPNW was overcharging DSDL for materials at the SCMHS project. Shortly before Thanksgiving Day, 2016, Dean Snodgrass, David Snodgrass (DSDL's president), Drew Snodgrass (unknown role), and Jonathan Snodgrass (information technology manager) met with Pickett and Lachner to discuss DSDL's concerns about SCMHS and another project. Mr. Lachner testified that he brought documents to that meeting that showed LPNW's costs for the SCMHS project, but DSDL staff would not review that information because Jonathan Snodgrass believed that some of the documents were fabricated. Following the meeting, Jonathan Snodgrass accessed Pickett's DSDL email and discovered additional documents that he believed to be incriminating. Dean Snodgrass, David Snodgrass, and Mr. Dirksen met with Pickett again on November 29, and terminated his employment on the spot.

After DSDL discharged Pickett, it undertook a broader review of the various projects for which LPNW had provided material or trucking service. Based on a review by Jonathan Snodgrass, DSDL sued Pickett and LPNW in state court for $716,000 (exclusive of punitive damages). *See* Main Case, Claim No. 8-1. Pickett filed a chapter 13 petition on October 22, 2018, thereby staying the state-court litigation. On January 15, 2019, DSDL filed this adversary complaint (based on the same facts and circumstances as the state-court suit), alleging damages of $678,337 (exclusive of punitive damages). Compl. (ECF No. 1) at 13. Then, in May 2019, in preparation for trial in this proceeding, DSDL retained Gregory Gadawski as an accounting

expert. Mr. Gadawski reviewed DSDL's figures and made various adjustments. Following Mr. Gadawski's review, DSDL submitted a trial brief that alleged reduced damages of $571,533 (exclusive of punitive damages). *See* Pltf. Trial Mem. at 2. At trial, DSDL further reduced its claimed damages to $558,295. Pltf. Exh. 269.

## II. Jurisdiction

I have jurisdiction to decide the claims at issue in this proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B) and (I).

## III. Analysis

Because DSDL's claims involve distinct factual and legal issues, I will discuss them separately, beginning with the fraud claims that dominate this proceeding.

A.  Fraud and Nondischargeability under § 523(a)(2)(A)

1.  Legal Standards

To prove fraud under Oregon law, a plaintiff must show (1) the defendant made a false, material misrepresentation, (2) with knowledge of its falsity and (3) intent that plaintiff rely on the statement, and (4) the plaintiff relied on the misrepresentation, (5) sustaining damage as a result. *Strawn v. Farmers Ins. Co. of Oregon*, 350 Or. 336, 351-352 (2011). Although fraud under § 523(a)(2) is governed by federal common law, the elements are essentially the same as under Oregon law, with one possible difference. With regards to reliance, Oregon case law is somewhat inconsistent in its terminology, with some cases suggesting that a plaintiff's reliance must be "reasonable." *See Oregon Pub. Employees' Retirement Bd. v. Simat, Helliesen & Eichner*, 191 Or. 408, 424-425. On the other hand, the Ninth Circuit has ruled that under § 523(a)(2)(A), a creditor's reliance must be "justified." *Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454, 1457 (9th Cir. 1992). I will return to this distinction later in this opinion.

Pickett notes that the transactions that form the basis for DSDL's complaint arise out of a contractual relationship, and the failure to perform a promise does not—generally speaking— provide a cause of action in tort. *See Comm'cns Group, Inc. v. FTE Mobilnet of Or.*, 127 Or.

App. 121, 126 (1994). DSDL's theory of the case implicates two exceptions to this general rule. First, someone who enters into a contract with an intent not to perform, or with reckless disregard for whether he or she could perform, may be liable for fraud. *Id.* Second, someone who is guilty of "actual fraud" cannot escape liability simply because the fraud occurred in the context of a contractual relationship. *See Husky Int'l Electronics v. Ritz*, 136 S.Ct. 1581, 1586 (2016). For example: if Pickett, while performing the contract, fabricated billing documents with the intent of cheating DSDL out of money, this would constitute fraud notwithstanding the overarching contractual framework.

      2.    <u>Was There a Material Misrepresentation</u>?

The first element of a fraud claim is a material misstatement or misrepresentation. DSDL runs into difficulty immediately because it contends that Pickett fraudulently promised to provide DSDL with advantageous pricing, yet the record contains no evidence of a sufficiently definite representation in this respect. Indeed, DSDL is not even consistent in its own terminology when describing the pricing that Pickett allegedly promised.

Based on my review of the evidence and relevant Oregon law, I find that Pickett did not make a material misrepresentation. Two critical issues underpin this finding. First, DSDL was unable to articulate what, exactly, Pickett promised. DSDL's employees used materially different terms when describing the prices that LPNW was supposed to provide. Mr. Dirksen testified varyingly that he expected LPNW to provide services "at a good price range," at "current market price or even better than that," and at the "best price in the market." Dean Snodgrass testified that LPNW would provide either "market or better" *or* "pass-through pricing" (depending on whether LPNW had the materials in inventory), and in either case, the "pricing and the competitive advantage [for DSDL] would be better than we could do anywhere." Operations manager Joshua Fetters testified that when he reviewed LPNW's price lists, he was tasked with ensuring that DSDL "was receiving the best market value" for

materials.  Employee Travis McClain[3] testified that the relevant metric was "best price," a concept that took into account both sticker price *and* quality (in which case, lowest price is not necessarily dispositive).  President David Snodgrass testified that LPNW's promise was to provide "best market price," and although he implied that this term was understood by all DSDL employees, he was unable to cogently express the commonly-understood meaning.  Moreover, DSDL did not introduce any evidence concerning the relevant market for landscape materials, or whether market prices are easily determinable.  The trial testimony is illuminating both because DSDL's witnesses could not agree on what representation Mr. Pickett allegedly made, and the testimony generally pointed to inherently ambiguous formulations of "market pricing."  *See e.g.*, *Harry v. Total Gas & Power North Am.*, 889 F.3d 104, 114 (2d Cir. 2018) (the term "market" is "an ambiguous term the definition of which depends on the classificatory purpose of the observer"); *Houston Gen. Ins. v. T.A.C.X.*, No. 94-35862, 1995 WL 713271 at *1 (9th Cir. 1995) (unpublished) (under Oregon law, "market value" is ambiguous for purposes of interpreting an insurance policy); *Southwest Insulation v. Gen. Insulation Co.*, No. 4:15-cv-601, 2016 WL 9244821 at *3 (N.D. Tex. 2016) (unpublished) (for purposes of a breach of contract claim regarding insulation sales, the term "competitive market prices" is ambiguous); *Schuchart v. Castle Harlan Partners IV, L.P.*, No. 1:06-cv-01597, 2006 WL 8448676, at *4 (M.D. Pa. 2006) (unpublished) ("fair market value" is ambiguous in a contract for sale of stock); *PQ Corp. v. Texasgulf, Inc.*, Civ. A, No. 90-7353, 1992 WL 122849, at *10 (E.D. Pa. 1992) (unpublished) (the term "posted domestic market price" is ambiguous in the soda ash industry).  As a result, if the plaintiff cannot consistently and concretely define the alleged representation, Pickett cannot be found to have made an actionable misstatement.

A second, related, reason for finding that DSDL has not proven a material misrepresentation stems from the nature of the alleged representation.  As DSDL describes it, Pickett promised that DSDL would get a good deal from LPNW.  This makes Pickett's alleged

---

[3] At the times relevant to this dispute, McClain worked as a project manager for DSDL.  He subsequently replaced Mr. Pickett as the manager of the commercial construction department.

representation a statement of value. Under Oregon law, representations regarding value cannot, generally speaking, form the basis for a fraud claim. *Jeska v. Mulhall*, 71 Or. App. 819, 821 (1985) ("statements of opinion, 'as, for example, expressions by a vendor commendatory of the thing which he is trying to sell are not actionable even though false.'" (*quoting Holland v. Lentz*, 239 Or. 332, 344 (1964)). An exception to this general rule applies when a false statement of value is made by someone in a fiduciary or "confidential" relationship with the plaintiff. *Id.* at 821-822. Even assuming there was a confidential relationship between Pickett and DSDL,[4] the surrounding circumstances undercut DSDL's allegations.

DSDL did not provide any evidence that Pickett proactively made representations about the pricing LPNW would provide. Rather, several witnesses stated that, at various times, DSDL employees *told* Pickett they expected certain advantageous pricing.[5] By all accounts, Pickett acquiesced to these statements by DSDL employees. Under Oregon law, "[t]o whom, with what knowledge and in what context a defendant makes a statement bears on whether a statement of opinion is a 'mere opinion of value' or an actionable 'misrepresentation of fact.'" *Jeska*, 71 Or. App. at 822. Here, I find that context matters a great deal. There was no evidence that Pickett proposed the pricing that DSDL complains it did not receive. To the contrary, DSDL demanded this pricing. While Pickett's acceptance of DSDL's demand may be adequate for purposes of proving offer and acceptance of a contract, the analysis is necessarily different for a fraud claim. DSDL was the party that came up with the concept of best market pricing (and its variations), and it should bear the responsibility for framing its demand in ambiguous and inconsistent terms.

---

[4] I am skeptical that there was a fiduciary or confidential relationship between Pickett and DSDL in this context, because when Pickett entered into any contract between LPNW and DSDL, he would have been acting in his capacity as an owner of LPNW, not an employee of DSDL. Nonetheless, DSDL has made a colorable argument that Pickett owed some sort of heightened duty to DSDL despite his obviously divided loyalties. *See generally Williams v. Pilgrim Turkey Packers*, 264 Or. 36 (1972). Because I believe DSDL's fraud claims fail on other grounds, I will assume without deciding that Pickett was in a confidential relationship with DSDL and therefore his representations regarding the value of LPNW's services are potentially actionable.

[5] The leading example of this one-way information flow comes from the previously-mentioned July 2016 meeting between Dean Snodgrass, Pickett, and Lachner. Pltf. Exh. 234. According to Dean Snodgrass's testimony, he wrote his notes *before* the meeting, for the purposes of framing the agenda. Although he testified that Pickett agreed to meet DSDL's demands, the record is clear that the concept of "market & better pricing" (as referenced in Exhibit 234) originated with Dean Snodgrass or some other owner or manager of DSDL.

Page 8 – OPINION

Additionally, as discussed in more detail in the following section, prior to the SCMHS dispute that led to Pickett's termination, there were several occasions when DSDL discovered that other vendors were offering lower prices than LPNW. When these incidents came to light, DSDL changed to the lower-cost provider or LPNW lowered its prices, but DSDL did not terminate the relationship or otherwise impose sanctions for violations of the supposedly sacrosanct mantra of "best pricing." Such behavior on DSDL's part contradicts its narrative that best pricing was a critical and mutually-understood component of the relationship between DSDL and LPNW.

The cumulative impact of all relevant facts and circumstances leads me to conclude that, as a matter of Oregon law, Pickett did not make misrepresentations sufficient to support a claim for fraud.

      3.      <u>If There Was a Misrepresentation, Was DSDL's Reliance Justified</u>?

As mentioned previously, courts variously refer to "reasonable reliance" and "justified reliance" when discussing fraud. Indeed, some Oregon courts treat these terms interchangeably. *See Oregon Pub. Employees' Retirement Bd. v. Simat, Helliesen & Eichner*, 191 Or. App. 408 (2004). Yet, for purposes of this case, the terms are not synonymous, and I believe *Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454 (9th Cir. 1992) provides critical guidance. *Kirsh* involved a plaintiff who lent money to a close friend and received a trust deed as security. It turned out that the trust deed was worthless because the collateral was already over-encumbered. The plaintiff, an experienced business lawyer, could have easily discovered this fact if he had obtained a title report, but he did not, citing his long relationship with the borrower. As the Ninth Circuit explained, it was arguably *unreasonable* for the plaintiff to forgo the simple step of obtaining a title report, but given all the surrounding facts and circumstances, he was nonetheless *justified* in relying on his longstanding friendship with the borrower. Here, while DSDL's reliance on any representation from Pickett regarding the value

of LPNW's goods or services was almost certainly unreasonable,[6] I do find it was justified—initially.

Just as the plaintiff in *Kirsh* was able to justifiably (if not reasonably) rely on his friendship with the defendant, here DSDL may justifiably rely on its thirty-year relationship with Pickett. The problem for DSDL is that the justification for its reliance quickly unraveled. The record reflects numerous times when DSDL employees found that LPNW was not charging competitive rates, but DSDL continued utilizing LPNW nonetheless. For example, Mr. Fetters testified that in "mid-2015" he started comparing LPNW's prices for certain materials with prices available from other vendors. According to Fetters, "a majority of the time," he was able to find lower prices at other suppliers. When he would bring these prices to Pickett's attention, LPNW would lower its price accordingly. Fetters testified that he also discovered LPNW charging higher prices than other DSDL vendors for certain materials for the Project BUS job.[7] Project manager Jackson Holibaugh testified about a project at a Residence Inn, where he discovered compost for purchase at a lower price than LPNW was charging (he switched to the lower-cost vendor). Notably, Holibaugh made this discovery in April 2016, at the same time that DSDL was preparing its bid for the SCMHS project. Despite a growing body of evidence that LPNW was not the lowest-cost provider, DSDL still selected LPNW as its soil subcontractor for SCMHS. Finally, as discussed in more detail later in this opinion, part of LPNW's work on the SCMHS project was providing BES soil.[8] In October 2016, when DSDL discovered lower-cost BES soil from another supplier, it cancelled its order with LPNW, even though that left LPNW with approximately one thousand cubic yards of soil that was ultimately ruined.

The evidence described in the previous paragraph provides critically important context: DSDL contends that it only agreed to do business with LPNW because it trusted Pickett and his

---

[6] Pickett was an employee of DSDL and an owner of LPNW. As someone who had clear loyalties to both parties in a series of commercial transactions, the conflict of interest should have been readily apparent to all involved.

[7] Fetters did not specify when he made the discovery concerning the Project BUS job, but other evidence suggests that it was likely mid-2016. *See* Pltf. Exh. 213.

[8] Although the court received extensive testimony about BES soil, no witness explained what "BES" stands for. Based on context, BES soil appears to be some type of blended soil product.

promise of best pricing. Yet, once DSDL discovered it was not receiving the best available price from LPNW, its reliance on Pickett's supposed representation was no longer justified. For whatever reason, LPNW was not providing the pricing that DSDL thought it was entitled to under the terms of its oral agreement. Regardless of whether this failure was based on an innocent misunderstanding or something more nefarious, once the failure was discovered, DSDL was not justified in continuing to rely on the alleged promise of "best pricing" (or any of the other similar terms that were used). Thus, as a matter of law, any damages incurred after Mr. Fetters began to discover pricing issues would not be recoverable via a fraud claim.

    4.    Did Pickett Act with Fraudulent Intent?

A fraud claim requires that the defendant make a false statement with knowledge that it is false. One result of DSDL's inconsistent terminology and lack of contractual formalities is that it is difficult for the trier of fact to draw an inference that Pickett even knew that LPNW was not honoring the terms that DSDL expected. President David Snodgrass testified that the hiring of LPNW was DSDL's first large-scale use of a subcontractor to perform landscaping work; yet, DSDL did not use a written agreement to define the terms because Pickett was "a trusted employee who'd worked his way up in our ranks from a crewman all the way up to department manager, so he had earned our trust. We have a culture of believing in people and trusting them to do the right thing, and with this employee [Pickett], based on that trust, just good communication is what we required." It is DSDL's prerogative to structure vendor relationships informally and rely on trust; but the relationship with LPNW cannot be characterized as one built on good communication. DSDL's expectations regarding price were multiple, conflicting, and vague. Based on the evidence received at trial, any failure by Mr. Pickett to provide the pricing that DSDL expected could just as easily be explained by his misunderstanding the terms as by intentional malfeasance. I therefore find that DSDL has not proven fraudulent or otherwise corrupt intent on Pickett's part.

5.    Did Pickett Enter into the LPNW-DSDL Contract with the Intent to Not Perform?

Oregon law recognizes a claim for fraud in cases where a defendant promises to perform a future act but "at the time of the making of the promise, there was no present intention of performance or, alternatively, that the promise was made with reckless disregard as to whether the promissor could or could not perform." *Jones v. Northside Ford Truck Sales*, 276 Or. 685, 690 (1976). The defendant's eventual failure to perform "is not a sufficient basis for an inference that the defendant never intended to perform." *Id.* at 691.

In this case, DSDL has produced no evidence of Pickett's intent at the time that the parties agreed to do business. Indeed, the record contains very little detail of any kind about the formation of the contract. During closing, counsel for DSDL stated that Pickett's intent to not perform was reflected in Plaintiff's Exhibits 167, 170, 171, 184, and 185. These documents all appear to relate to events that occurred after DSDL and LPNW formed a contract, and it is not clear to the court how these exhibits are relevant to Pickett's intent at the time of formation.

6.    Is There Evidence of Actual Fraud?

Actual fraud "consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." 4 Richard Levin & Henry J. Sommer, *Collier on Bankruptcy* ¶ 523.08[1][e] (6th ed. rev. 2019). The "key element" in proving actual fraud is a showing of scienter, or intentional wrongdoing. *Id.* Here, DSDL has succeeded in proving billing errors on LPNW's part, so the ultimate question is whether these errors are attributable to Pickett's intentional wrongdoing, or some other cause.

DSDL has produced no direct evidence of Pickett's fraudulent intent. Of course, this is hardly unusual since wrongdoers frequently refrain from broadcasting their intent to commit fraud. Successful fraud plaintiffs often rely on circumstantial evidence of intent. *See Bradford v. Comm'r*, 796 F.2d 303, 307 ("Because fraudulent intent is rarely established by direct evidence, this court has inferred intent from various kinds of circumstantial evidence."); *Orr v. Bauer*, 156 Or. 409, 417 (1937) ("Fraud is never presumed . . . but fraud may be proved by

circumstantial evidence."). Prior the parties' closings, I asked counsel for DSDL to summarize the evidence of fraudulent intent upon which his client relied. Counsel provided numerous instances of what he characterized as evidence of fraudulent intent. As discussed below, I am not persuaded.

"Working the numbers." DSDL asserts that Plaintiff's Exhibits 12, 16, 20-24, and 27-28 provide evidence that Pickett manipulated DSDL's internal cost estimates for the purposes of being able to increase the amount of LPNW's eventual bids. This argument fails for two reasons. First, the evidence is highly attenuated, and does not satisfy DSDL's burden of proving fraudulent intent. Multiple witnesses testified that DSDL's estimators would develop project cost-estimates, subject to ultimate review and approval by the project manager. Although Pickett, by his own admission, was involved in the estimating process, he was not an estimator or project manager, and therefore he was not in charge of estimating nor did not have the ability to single-handedly manipulate project budgets to his advantage.

Second, to the extent that Pickett was able to benefit from being on two sides of a transaction, this is a problem entirely of DSDL's own creation. DSDL agreed to a relationship in which one of its key employees owned a vendor that bid for DSDL's business. By design, this relationship subjected Pickett to dueling duties of loyalty. By the time of the trial, DSDL had dropped any claims that Pickett improperly *obtained* internal company information; rather, DSDL now argues that Pickett wrongfully *used* internal information to benefit LPNW. But this is not a clear-cut case like when a defendant steals trade secrets and sells them to a competitor. Rather, DSDL complains that LPNW bid on projects where Pickett had knowledge of DSDL's cost estimates for that same project. In the course of his work for DSDL, Pickett would learn things that he could not un-learn when he later acted on behalf of LPNW. This is roughly analogous to the case of a lender who prepares a materially inaccurate loan application and presents it to the applicant for his signature. *See Unit No. 1 Fed. Credit Union v. Walker (In re Walker)*, 183 B.R. 47, 49-51 (W.D.N.Y. 1995). Yes, signing a materially inaccurate financial statement is generally grounds for nondischargeability under § 523(a)(2)(B), but context matters

and when the creditor is responsible for the inaccuracy, that can be a bar to recovery. Here, the improper use of confidential commercial information could be grounds for nondischargeability, but it matters that DSDL created the situation and made no serious attempts to prevent Pickett from being exposed to internal information that created a conflict of interest.

Dean Snodgrass testified that he was not concerned about a conflict of interest because Pickett allegedly "convinced" him that LPNW would provide "the absolute best pricing." This is circular—if not downright nonsensical—logic: DSDL set up a situation where conflicts of interest were guaranteed, but seeks to minimize its culpability by claiming that Pickett promised the company a good deal. DSDL cannot now claim damages as the result of its own shortsightedness.

Concealed bids. When framing its narrative prior to, and at the opening of, the trial, DSDL alleged that Pickett obtained bids from suppliers or subcontractors who offered lower prices than LPNW, but concealed these documents from DSDL. In actuality, the evidence of these acts of concealment is less shocking than DSDL would have the court believe. Two specific instances were discussed at trial, neither of which convinces me that Pickett engaged in fraudulent concealment.

First, according to Nathan Dirksen, DSDL's bid for the SCMHS project was based on an anticipated compost price of $12 per yard, to be purchased from a vendor named Rexeus. In approximately August 2016 (after work on the project started), Rexeus announced that it did not have the specific compost product in stock in the Portland area. Pickett then obtained the compost from Grimm's Fuel Company at a price of $19.33 per yard. The allegation of concealment arises from the fact that in July 2016, Pickett had received two compost quotes from Grimm's: one for $10 per yard, and another for $20.40 per yard. Pltf. Exh. 20. After DSDL terminated Pickett's employment and Mr. Dirksen discovered the two Grimm's quotes, he concluded, based solely on his reading of the documents, that Pickett had lied to him. But Dirksen did not specify what the lie was, and he arrived at this conclusion without knowledge of all relevant facts and circumstances. Pickett testified that he was constrained in his choice of

materials because, to his knowledge, only one type of Grimm's compost (i.e., the more expensive variety) had been approved by the general contractor as meeting the project specifications. Under cross-examination, Pickett admitted that the less-expensive compost was ultimately approved for use, but he asserted he was not aware of this fact until after work on the project was under way. DSDL did not introduce any evidence showing that Pickett knew of this approval at the bidding stage, nor did it explain why Pickett would obtain any benefit from using the more expensive material if it were not necessary.

The second allegation of concealment also concerned the SCMHS project. Testimony revealed that this was not so much a case of concealing a bid, but of allegedly concealing information from another bidder. Project manager Travis McClain testified that DSDL received bids from LPNW and Ron Roth Construction for soil screening, but both bids included on-site hauling—a component that had been removed from the scope of work at some point during the bidding process. Ron Roth, the owner of the eponymous company, testified that he was not aware that the on-site hauling had been removed from the scope of work, and that his bid would have been lower if he had known this.[9] DSDL accuses Pickett of withholding this information from Roth. Even though the evidence is clear that Roth did not receive the information regarding the revised scope of work, DSDL did not prove when Pickett became aware of this fact, nor that he had a duty to convey the information to Roth. Indeed, DSDL employees generally testified that project managers were responsible for the bidding process, so it would seem that McClain (the SCMHS project manager) was the party who should have made sure that Ron Roth's bid was based on complete and up-to-date information.[10]

---

[9] The record is clear that LPNW originally submitted a bid based on the same misinformation, but it is unclear to the court whether LPNW ever specifically revised its bid to account for this change in scope. Part of the confusion arises form the fact that both LPNW and Ron Roth Construction revised their bids numerous times due to multiple job specifications which were changing during the bidding process.

[10] For his part, McClain testified that he did not seek prices from additional soil subcontractors because "I didn't really know where else to go . . . . I was new here." DSDL's counsel tried to frame this lack of diligence as the result of Pickett intimidating or otherwise pressuring his colleagues, but this is refuted by the experience of Mr. Fetters who testified to switching from LPNW to lower-cost providers without interference from Pickett.

Invoice approval irregularities.  DSDL argued at trial that it set up a special review procedure for approving LPNW invoices, but that 108 invoices (totaling $219,070.24) were paid without undergoing the required special review.  DSDL contends that this is proof of Pickett's fraud.  I find the evidence overwhelmingly indicates that payment of these invoices resulted entirely from DSDL's own administrative failures.

The evidence establishes that invoices received by DSDL were approved by a manager before being sent to the accounting office for issuance of a check.  According to Nathan Dirksen, this meant that Pickett was sometimes responsible for approving LPNW invoices.  To address this obvious conflict of interest, Dirksen testified that any LPNW invoice that had been approved by Pickett also had to be reviewed and approved by Joshua Fetters as a "double check" before going to accounting.  DSDL introduced an unnumbered demonstrative exhibit showing that 108 LPNW invoices were paid even though they had been approved only by Pickett, without a secondary review by Fetters.  Yet neither Fetters nor anyone else testified that Pickett was responsible in any way for preventing this review.

When evaluating the meaning of these 108 invoices, it is critical to consider the mechanics of payment.  Dirksen and Fetters both testified that all payments to LPNW were made by check, and that Dean Snodgrass signed those checks.  Furthermore, according to Dirksen and Fetters, when Dean Snodgrass received checks for signature, the associated invoice or other supporting documentation was attached.  Accordingly, Snodgrass could have easily ensured that all LPNW invoices had undergone the required secondary approval process by looking for a second approval signature.  Snodgrass apparently did not do this.  Far from proving fraud on Pickett's part, this evidence shows that DSDL did not follow minimally adequate procedures to guard against improper payments.

Materials markup.  DSDL alleges its pricing agreement with LPNW specified that LPNW could not charge a markup on materials unless it held the materials in its own inventory.  The evidence shows that LPNW did sometimes charge a markup for materials that it did not hold in inventory, and DSDL argues that this practice is, by itself, proof of fraud.  I disagree.  When

LPNW ordered materials from other companies in response to a DSDL purchase order, LPNW still bore some risk of loss. For example, DSDL placed an order for BES soil as part of the SCMHS project. Mr. Lachner testified that LPNW purchased and prepared the BES soil at the time of DSDL's ordering because LPNW lacked a suitable storage space for this particular material. In October 2016, DSDL cancelled this order, citing its ability to procure comparable material for less money (Def. Exh. 19), and approximately one thousand cubic yards of BES soil was ruined in the rain. LPNW absorbed the financial impact of this ruined material.

Setting aside whether LPNW's markups were a breach of contract, I do not find this pricing to be self-evident proof of fraud. As project manager Travis McClain testified, DSDL would sometimes ask subcontractors to procure materials on complex projects so that "they can manage their material that they needed immediately, versus having us manage it for them." This reasoning reveals that there is a cost associated with obtaining and moving materials. And as LPNW learned, purchasing materials also entails a risk of loss. For LPNW to set its prices to account for the costs and risks associated with materials-procurement risk is standard business practice, not—as DSDL would have it—an incontestable indicator of fraud.

"Gun jumping." DSDL points to two instances of LPNW allegedly beginning work on a project before it had formally received a contract from DSDL. DSDL claims that these instances show that Pickett was unfairly using his influence to ensure that LPNW received contracts from DSDL. I find that there are adequate alternative explanations for these two episodes of alleged gun-jumping, and DSDL has not come forward with evidence casting doubt on these explanations. First, DSDL alleges that Lachner and another LPNW worker attended a subcontractor orientation training at the SCMHS project three days before DSDL accepted final bids from subcontractors. But DSDL's documentary evidence of this event also provides an alternate explanation: at the time, Lachner stated that he had delivered equipment to the jobsite, and he had to complete the required training before he could make the delivery. Pltf. Exh. 23, at 1. Second, DSDL alleges that LPNW purchased compost in the Medford area in anticipation of the Northgate project, before it was awarded that contract. Pickett admitted to this pre-purchase,

and noted that he had family connections in the area and was confident he could find alternate uses for the compost if LPNW did not receive the Northgate contract. Both of these explanations are credible, and DSDL did not produce any impeachment evidence.

Volume of billing errors. DSDL contends that the sheer number of billing errors made by LPNW is circumstantial evidence of fraud. I find that this argument does not hold together under close examination because many of the alleged errors rest on a shaky evidentiary foundation. As a threshold matter, I must note that just because LPNW made an error does not necessarily mean that Pickett had anything to do with it. Pickett and Lachner both testified that they shared responsibility for preparing and sending invoices. Indeed, they provided some detail on how they allocated responsibility for invoicing. DSDL could have used this information to try and determine which erroneous invoices were mostly likely attributable to Pickett; however, DSDL did not do so, and the court will not discard the principles of limited liability by making Pickett responsible for every error made by the limited liability company of which he was a part owner.

Moreover, even though DSDL certainly proved *some* amount of billing errors, many of the alleged errors do not always stand up under a closer look. With its 345 trial exhibits (totaling more than four linear feet) DSDL entered the trial with the visual trappings of overwhelming evidence. But many documents are duplicated in the exhibits, numerous exhibits were never used (either for DSDL's primary case or for impeachment), and some exhibits that were closely examined raise more questions than they answer. Given the length of the trial, I cannot discuss every discrepancy, but I will describe three, by way of example.

The first example concerns the project that the parties refer to as "205 Logistics." LPNW's work on this job included hauling "site strippings" from the job site for disposal at Portland Road and Driveway Company ("Portland Road"). DSDL alleges that that LPNW charged $18 per yard to dump site strippings, even though Portland Road only charged LPNW $10 per yard. But the evidence regarding LPNW's cost is shaky: Mr. Fetters testified that he called Portland Road and spoke with an unnamed employee who informed him that as a *general*

*matter*, Portland Road charged $10 per yard for dumping site strippings. According to Fetters, "that was kind of the end of that investigation." But Fetters's testimony only concerned Portland Road's general pricing, not what that company actually charged LPNW for this specific job.[11] DSDL also relies on several invoices produced by Portland Road in response to a subpoena, noting that none of those invoices correspond with the seven truckloads of site strippings that LPNW states it hauled to Portland Road on June 10, 2016.[12] Pltf. Exh. 8. But no one from Portland Road testified, nor is the subpoena from DSDL in the record.[13] Accordingly, DSDL has not proven that this apparent discrepancy is the result of Pickett's misconduct as opposed to other potential explanations. For example, LPNW could have paid for these transactions in cash,[14] the transactions could have been recorded under a different customer profile, Portland Road could have made a bookkeeping error, or the relevant transaction records could have been outside the scope of the documents requested in the subpoena. There are too many unknown variables for me to find proof of fraud.

A second example relates to the SCMHS project. DSDL alleges that "Pickett . . . caused LPNW to provide DSDL only 5,490 cubic yards of compost, but billed for 7,500 cubic yards." Pretrial Order (ECF No. 36) at 6. Mr. Dirksen testified that this alleged discrepancy is proven by numerous invoices from Grimm's Fuel Company. Pltf. Exh. 4, at 2-111. DSDL's forensic accounting expert, Gregory Gadawski testified that he reviewed the Grimm's billing records as part of his examination. *See also*, Gadawski Report, Exh. A (stating that he reviewed "Grimm's Fuel Company delivery tickets for South Cooper Mountain High School project" and "Grimm's Fuel Company account summary for LP Northwest LLC"). Mr. Gadawski's report does

---

[11] Fetters further testified that Pickett stated that Portland Road charged a higher than normal price because of the quality of the strippings from this project. Nothing in his testimony contradicted Pickett's alleged justification.

[12] Actually, there is one Portland Road invoice from June 10, 2016, which does relate to the 205 Logistics project, however the invoice is marked "VOID," and the customer ledger produced by Portland Road similarly suggests that that invoice was voided.

[13] Although Jonathan Snodgrass testified about his review of records subpoenaed from suppliers (including Exhibit 8) his testimony only concerned how he used the documents, not how they were obtained or what data the documents allegedly contain.

[14] Indeed, one invoice for an unrelated transaction indicates that LPNW did pay in cash, and that invoice does not appear on the LPNW account summary included in Portland Road's document production. *See* Exh. 8, at 13 and 7.

conclude that LPNW overcharged on the SCMHS project, but when it comes to the quantities of materials, the report shows that LPNW invoiced DSDL for the same quantities reflected in underlying tickets from Grimm's. *See id.*, Exh. B. To be fair to DSDL, it is entirely possible that LPNW did make an error in its compost billing for the SCMHS project,[15] but not every billing error is the result of fraud. In a case of this complexity, DSDL was responsible for presenting evidence of fraudulent intent in a highly organized and unambiguous manner; I do not believe it did so here.

As a final example, I would cite DSDL's claimed damages in relation to the Northgate Mall project. Here, the information in the damages calculations do not match the third-party subcontractor records upon which DSDL relies. Nathan Lachner testified about the operational complexities of this job: the customer had a large quantity of on-site soil that needed to be loaded into LPNW's trucks and hauled to Visar Construction Company's location in Central Point, Oregon. Visar would then screen the soil and blend it with compost that had been delivered by another trucking company, Johnny Cat, Inc. LPNW was then responsible for hauling the blended soil back to the worksite. Lachner testified that the original plan for this project did not work because the on-site soil was too dry, and therefore LPNW was forced to obtain additional, higher-quality, dirt from another source while the screening work was underway. No executive-level managers from DSDL were present at the Northgate worksite, and no witness indicated that DSDL interviewed any on-site workers when conducting its investigation.

DSDL's calculation of alleged billing errors for the Northgate project appears to be based solely on a review of documents obtained from Visar and Johnny Cat. DSDL asserts that LPNW charged for hauling 6,478 yards of finished product, even though only 4,698 yards were actually produced. Pltf. Exh. 237, at 6. Yet the billing documents produced by Visar (the entity actually responsible for the production of the finished product) indicate that it produced 5,290 yards of

---

[15] There was testimony that Pickett admitted to such an error prior to his firing, and Pickett did not contradict this testimony.

blended soil.[16]  Pltf. Exh. 10, at 3-5.  True, the quantity of finished product suggested by the

Visar records is 18% less than the quantity apparently billed by LPNW, but it is also 13% greater

than the quantity DSDL used to calculate its damages.  The point here is that this discrepancy

casts doubt on the accuracy of DSDL's overall calculations.  Jonathan Snodgrass testified that he

calculated DSDL's damages by reviewing relevant documents and computing improper billing

amounts.  But Snodgrass and Gadawski both testified that Snodgrass's calculations contained

errors that Gadawski later had to adjust.  Even more concerning, DSDL bases its damages claim

on 32 separate projects,[17] even though Mr. Gadawski only reviewed the underlying

documentation for the three largest of these projects.  This lack of a complete review by DSDL's

expert casts doubt on the accuracy of the large number of billing errors that DSDL cites as

evidence of fraud.  Finally, I would note that the testimony regarding Northgate revealed an

important fact: landscaping companies typically bill for soil and aggregate materials by the cubic

yard.  Unlike measurement of weight, cubic yardage is determined visually, and there is a degree

of subjectivity in estimating how many yards of material a given truckload contains.  This could

easily account for some apparent discrepancies in source documents, but DSDL did not address

this issue when calculating its damages, thereby casting additional doubt on its math.

Perceived cover-ups.  A frequent refrain from DSDL's witnesses was that when they

identified billing errors or other concerns, Pickett always had an explanation.  DSDL contends

that these explanations are evidence of Pickett's deviance and bad faith.  But it is ultimately up to

the trier of fact to determine whether Pickett's explanations are either credible or evidence of

fraud.  To do so, I must evaluate Pickett's explanations in the context of his overall credibility.

After listening to Mr. Pickett's 3.8 hours of testimony, I find him to be a credible witnesses, for

three specific reasons.  First, Pickett's demeanor in the courtroom reflected positively on his

credibility.  Unlike many witnesses at this trial, Pickett's answers regularly made sense, his

[16] The same records suggest that there were "a couple hundred yards" of unused dirt left over at the end of the project.  Pltf. Exh. 10, at 36.  Without knowing the terms of the contract between DSDL and LPNW, I cannot determine which party bore financial responsibility for the loss represented by this unused product.
[17] See Pltf's Exhs. 236-267A (source documentation by project).

overall narrative was consistent, and he did not have to adjust or defend any of his testimony based on prior inconsistent deposition testimony. Second, Mr. Lachner corroborated many material facts that Pickett testified to. I find this noteworthy because—unlike the DSDL workers who testified in support of their employer's case—Lachner and Pickett are not positionally aligned in this matter. Lachner's interest in LPNW became virtually worthless when the company became embroiled in a dispute between Pickett and Pickett's employer. Not only did Lachner lose his financial investment, he has also incurred the cost of hiring counsel to protect himself and the company in this litigation and LPNW's chapter 7 case.[18] In addition to financial burdens, Lachner was compelled to interrupt his vacation to return to Portland and testify in this trial. In spite of all these potential sources of adversity, Lachner corroborated several key parts of Pickett's testimony even though Lachner (like all witnesses except Pickett and David Snodgrass) was excluded from the courtroom for witness testimony. Third, all witnesses who testified about the formation of LPNW agreed that Pickett brought the business opportunity to DSDL before pursuing it himself. Furthermore, the DSDL employees who testified were nearly universal in expressing trust in Pickett prior to the onset of the current dispute. This suggests to me that the DSDL witnesses who expressed opinions (based only on circumstantial evidence) about Pickett's fraudulent intent were motivated more by a desire to support their employer than by a commitment to convey their own, personal, unadulterated opinion.

Conclusion. I find that DSDL has not proven by a preponderance of the evidence that Pickett made a fraudulent representation or committed actual fraud. Accordingly, DSDL has not prevailed on its claims for fraud and nondischargeability under § 523(a)(2)(A).

B.    Conversion

Conversion is "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to

---

[18] *See In re LP Northwest, LLC*, Case No. 18-33646-tmb7, ECF No. 43 (Motion to Intervene) and Claim No. 6-1 (proof of claim for LPNW legal fees paid by Mr. Lachner).

pay the other the full value of the chattel." *Becker v. Pacific Forest Indus.*, 229 Or. App. 112, 116 (quoting Restatement (Second) of Torts § 222A (1965)).

In granting partial summary judgment to Pickett on the conversion claim, I held that DSDL had only made two plausible allegations of conversion: a $1,544 septic tank, and certain documents. At trial, DSDL did not provide any evidence supporting a conversion claim as to documents.

DSDL did pursue its conversion claim regarding the septic tank. It proved that Pickett ordered a septic tank in November 2015, in connection with a DSDL project at Nike. Pltf. Exh. 87. The purchase price (paid by DSDL) was $764.26, not the $1,544 alleged in DSDL's complaint. Compare *id.* with Pretrial Order at 8. DSDL's theory that Pickett converted this tank for his own personal use is based purely on speculation arising from the timing of his home remodel. Pickett, on the other hand, gave a detailed explanation of how he used the septic tank on the Nike project for the removal of sludge. DSDL's own exhibits indicate that the project did entail soil removal, and that work was performed in November, when moisture contents can be high. *See* Pltf. Exh. 91.

Weighing the detail of Pickett's explanation against the circumstantial nature of DSDL's allegation, I find that DSDL has not prevailed on its conversion claim.

C.    Intentional Interference with Economic Relations

Intentional interference with economic relations requires: (1) the existence or prospect of a business relationship, (2) intentional interference with that relationship (3) by a third party (4) through improper means or for an improper purpose, and (5) a causal effect between the interference and the harm to the business relationship, plus (6) damages. *Allen v. Hall*, 328 Or. 276, 281 (1999).

There was hardly any trial evidence relevant to this claim. DSDL contends that Pickett interfered with DSDL's "economic relations with its vendors, general contractors and project owners." Pretrial Order at 12. But there was simply no evidence of any harm to DSDL's relationships with general contractors or project owners. There was slight evidence concerning

Page 23 – OPINION

relations between DSDL and a handful of subcontractors who bid (or might have bid) on the SCMHS project, but no evidence indicated that these relationships were harmed by any improper action on Pickett's part. Accordingly, DSDL's claim for intentional interference with economic relations fails.

D.  <u>Section 523(a)(4)</u>

Section 523(a)(4) excepts from discharge debts for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Here, DSDL does not rely on the fraud or defalcation prong, but only on embezzlement or larceny, neither of which requires that the debtor acted in a fiduciary capacity. Pltf. Trial Mem. at 13-14; *Transamerica Commercial Fin. Co. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991) (fiduciary relationship not required for embezzlement or larceny). For purposes of § 523(a)(4), embezzlement and larceny are defined by federal common law. *Id.* (embezzlement); *Ormsby v. First Am. Title Co. of Nev. (In re Ormsby)*, 591 F.3d 1199, 1205 (9th Cir. 2010) (larceny). To prove embezzlement, a plaintiff must show (1) property rightfully in the possession of a non-owner, (2) the non-owner's appropriation of the property to a use other than which it was entrusted, and (3) circumstances indicating fraud. *Littleton*, 942 F.2d at 555. Larceny is "a felonious taking of another's personal property with intent to convert it or deprive the owner of the same." *Ormsby*, 591 F.3d at 1205.

DSDL's dispute with LPNW and Pickett is clearly a business dispute arising from an ambiguous contractual arrangement and sloppy billing practices. DSDL did not prove the elements of either embezzlement or larceny, and therefore its claim under § 523(a)(4) fails.

## IV.  <u>Conclusion</u>

Both parties appear to have poured considerable resources into this litigation. As the parties must realize, to their chagrin, the amount of time and money spent on this case could have been avoided by some common-sense planning at the outset of the commercial relationship between DSDL and LPNW. Although I have ruled against DSDL, I do not mean to say plaintiff's claims are based on nothing. Clearly, LPNW billed for amounts to which it was not entitled. But Pickett is now a chapter 13 debtor, which limits DSDL's options for recovery. In

Page 24 – OPINION

zealous pursuit of recovery, DSDL decided to pursue complex fraud claims against Pickett, in the hopes of establishing a nondischargeable debt. Fraud requires that a plaintiff prove more than a simple error, and for the reasons set forth in this opinion, DSDL did not carry its burden of proof. I find in favor of Mr. Pickett. Counsel for Pickett should submit a judgment consistent with the terms of this opinion no later than December 30, 2019.

###

cc:    David Anderson
       David Hosenpud